Upon review of the competent evidence of record with respect to the errors assigned, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, modifies and affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. An employment relationship existed between plaintiff and defendant-employer at all relevant times.
3. Fireman's Fund Insurance Company was the carrier of workers' compensation insurance on behalf of defendant-employer from 1 May 1994 through 1 May 1995.
4. The medical reports of Dr. T. Drake McDonald, Dr. David S. Baker, II, Dr. Gary Sobel, and Dr. W. Stuart Tucker, Jr., are authentic business records and may be received into evidence.
5. Plaintiff's average weekly wage was Three Hundred Eighteen and 00/100 Dollars ($318.00).
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a 54-year-old woman with an eighth grade education.
2. Plaintiff was sitting for an elderly person at the time of the hearing before the Deputy Commissioner. This is not a permanent job. At the time of the hearing, plaintiff had earned $160.00 per week and had been sitting with this elderly person for two and one-half months.
3. Before working with defendant-employer, plaintiff worked in various factory production jobs, inspected pictures for Delmar Studios, and cleaned houses.
4. Until plaintiff's last workday with defendant-employer on 3 June 1994, she worked as a lay cutter, a lab worker, a trimmer, and a chainer. During the last several years with defendant-employer, plaintiff worked primarily as a trimmer and chainer. Her job as a trimmer consisted of trimming and shaping rubber tubing on a molder and grinder. Her job as a chainer consisted of assembling chains on toilet tank bowls. Both jobs required plaintiff to use her arms, hands, wrists, and fingers in repetitive movements eight hours daily and forty hours weekly. As a trimmer, plaintiff was expected to produce between 2,500 and 3,000 finished products daily. As a chainer, plaintiff was expected to produce approximately 3,000 finished products daily.
5. During the last several years with defendant-employer, plaintiff began experiencing pain in both of her forearms, wrists, and hands. Plaintiff reported these symptoms to the company nurse, who wrapped her wrists and gave her aspirin or Tylenol. In April 1994, the pain in plaintiff's wrists and hands became so bad that she fell behind her production quota by fifty percent (50%). On 3 June 1994, plaintiff's employment with defendant-employer was terminated.
6. Following her termination by defendant-employer, plaintiff worked as a cleaning person at the Charlotte Airport. Plaintiff secured this position through Olsten Staffing Services, and was paid on a full-time hourly basis. Plaintiff was unable to continue in this position because of pain in her hands.
7. Plaintiff was diagnosed with diabetes mellitus in 1977. From July 1987 until 7 April 1995, plaintiff was treated at the Nalle Clinic in Charlotte, North Carolina, for diabetes mellitus, chest pain, headaches, and various other ailments.
8. Dr. Gary Sobel of the Kaiser Permanente Clinic in Charlotte, North Carolina, treated plaintiff from 22 June 1995 to 11 March 1996 for her diabetes and for pain in her arms and hands. On 23 August 1995, plaintiff again saw Dr. Sobel and complained to him that both of her hands and arms were hurting and that the pain worsened at night. The pain in her hands prevented her from opening lids and doing similar chores at home. Dr. Sobel referred plaintiff to Dr. Thomas Drake McDonald, a neurologist, for nerve conduction studies. On several subsequent visits to Dr. Sobel, plaintiff continued to complain of pain and numbness in her forearms and hands.
9. Plaintiff first saw Dr. McDonald on 2 November 1995, at which time he performed a nerve conduction study on both of plaintiff's arms and wrists. Plaintiff's major complaint on 2 November 1995 was bilateral hand pain that had been present since 1987 but had gotten worse in the several months before this visit. On 2 November 1995, Dr. McDonald diagnosed plaintiff as having bilateral carpal tunnel syndrome. Dr. McDonald referred plaintiff to a hand surgeon for possible carpal tunnel release surgery. Until such surgery, Dr. McDonald recommended that plaintiff wear wrist braces.
10. On 15 January 1997, plaintiff again saw Dr. McDonald and described her work duties while employed with defendant-employer. Dr. McDonald concluded that the repetitive motion work plaintiff performed while working for defendant-employer significantly contributed to the development of her bilateral carpal tunnel syndrome. According to Dr. McDonald, about fifty percent of the plaintiff's bilateral carpal tunnel syndrome is related to her repetitive motion work with defendant-employer and fifty percent is related to her diabetes.
11. Plaintiff first saw Dr. David S. Baker, II, an orthopedic hand specialist, on 22 November 1995. Dr. Baker prescribed Vicodin for pain and scheduled plaintiff for x-rays. On 28 November 1995, plaintiff was again examined by Dr. Baker who determined that her x-rays revealed degenerative arthritic changes. Dr. Baker diagnosed plaintiff as having bilateral carpal tunnel syndrome and degenerative arthritis in her hands, and he recommended that she undergo carpal tunnel release surgery. On subsequent visits, plaintiff complained that the pain in her hands and wrists was getting progressively worse. Plaintiff was scheduled to have carpal tunnel release surgery performed by Dr. Baker on 3 June 1997.
12. The degenerative arthritis in plaintiff's hands is not related to her carpal tunnel syndrome. However, her diabetes and arthritis will likely delay or prevent optimal recovery following carpal tunnel release surgery.
13. On 19 April 1996, plaintiff first gave notice to defendant-employer of her bilateral carpal tunnel syndrome by mailing her claim for workers' compensation benefits. Her claim was filed with the Industrial Commission on 23 April 1996. Plaintiff first learned that she had bilateral carpal tunnel syndrome on 2 November 1995, when Dr. Thomas McDonald informed her of his diagnosis. Plaintiff first learned of the possible compensable nature of her bilateral carpal tunnel syndrome in March 1996, after her attorney confirmed with Dr. McDonald and Dr. Baker the possible work-related etiology of plaintiff's bilateral carpal tunnel syndrome. Plaintiff's ignorance of the possible compensability of the disease constitutes reasonable excuse for her untimely notice to defendants.
14. Defendants contend that they are prejudiced by the untimely notice, because of the delay in work-related diagnosis and treatment, thus prolonging plaintiff's disability. Given that plaintiff did not learn of the compensable nature of the disease until March 1996, defendants are unable to show prejudice from the untimely notice.
15. Plaintiff's employment with defendant-employer as a trimmer and chainer exposed her to a greater risk of contracting carpal tunnel syndrome than members of the general public not so employed.
16. Plaintiff's employment with defendant-employer as a trimmer and chainer was a significant contributing factor in her development of bilateral carpal tunnel syndrome.
17. As a result of her bilateral carpal tunnel syndrome, plaintiff has been continuously unable to earn the same wages with defendant-employer or in any other employment, from 3 June 1994 through the present and continuing. However, plaintiff has earned actual income from her periods of employment with Olsten Staffing Services and sitting for the elderly person.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's bilateral carpal tunnel syndrome constitutes an occupational disease. Her employment with defendant-employer as a trimmer and chainer placed her at an increased risk of developing carpal tunnel syndrome and was a significant contributing factor to her development of carpal tunnel syndrome. N.C. Gen. Stat. § 97-53(13).
2. Plaintiff has not complied with the notice requirements of the North Carolina Workers' Compensation Act. However, she has demonstrated a reasonable excuse for her failure to do so, and defendants have not been prejudiced by the late notice. Any prejudice suffered by defendants is outweighed by the equities in plaintiff's favor in this case. N.C. Gen. Stat. §§ 97-22, 97-58.
3. As a result of plaintiff's bilateral carpal tunnel syndrome, she has been temporarily totally disabled from 3 June 1994 through the present and is entitled to compensation at the rate of Two Hundred Twelve and 00/100 Dollars ($212.00) per week during the period of her disability, except during the time that she is entitled to benefits under G.S. 97-30 only, as noted in paragraph 4 below. N.C. Gen. Stat. § 97-29.
4. Defendants are entitled to a credit for wages paid to plaintiff while plaintiff worked at the Charlotte Airport for Olsten Staffing Services and while sitting for the elderly person. During these periods, plaintiff shall be paid any compensation which may be owed for partial disability pursuant to G.S. 97-30. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the credit described in paragraph 4 below, defendants shall pay plaintiff temporary total disability compensation at the rate of Two Hundred Twelve and 00/100 Dollars ($212.00) per week from 3 June 1994 and continuing until plaintiff returns to work or until further order of the Industrial Commission. Accrued compensation shall be paid to plaintiff in a lump sum subject to an attorney's fee approved in paragraph 3 below.
2. Defendants shall pay all medical expenses incurred by plaintiff for the treatment of her occupational disease, for so long as such treatment tends to give relief, effect a cure, or lessen plaintiff's period of disability, when the bills have been submitted and approved by the Commission.
3. A reasonable attorney's fee of twenty-five percent (25%) of the benefits awarded to plaintiff in paragraph one of this Award is approved for plaintiff's counsel. Of any lump sum awarded to plaintiff, defendant shall deduct twenty-five percent (25%) and forward payment directly to plaintiff's counsel. Of the remaining amount, defendant shall forward every fourth check directly to plaintiff's counsel.
4. Plaintiff shall submit to defendants an accounting of all earnings from plaintiff's employment at the Charlotte Airport in 1996 and while sitting for the elderly person. Defendants are entitled to a credit for any wages paid to plaintiff during the periods plaintiff was working. Plaintiff is entitled to compensation pursuant to G.S. 97-30 during the periods she worked at reduced wages.
5. Defendant shall pay the costs of this action, including, but not limited to, expert witness fees in the amount of Two Hundred Fifty and No/100 Dollars ($250.00) for Dr. Stuart Tucker, Two Hundred Fifty and No/100 ($250.00) for Dr. Gary Sobel, and Two Hundred Fifty and No/100 Dollars ($250.00) for Dr. Drake McDonald.
 S/ ________________________ RENÉE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/ ______________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ______________________ LAURA K. MAVRETIC COMMISSIONER